

# NUMBER 13-22-00237-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JOSEPH MICHAEL SANDOVAL,**                                            **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                        **Appellee.**

---

### On appeal from the 117th District Court
### of Nueces County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Justice Longoria**

Appellant Joseph Michael Sandoval was convicted of continuous sexual abuse of a young child, a first-degree felony, and sentenced to thirty-five years' imprisonment. *See* TEX. PENAL CODE ANN. § 21.02(b). In his sole issue on appeal, appellant asserts that his trial counsel was ineffective. We affirm.

## I.  BACKGROUND

The State indicted appellant on one count of continuous sexual abuse of a young child, specifically alleging:

> [O]n or about October 9, 2009 . . . during a period that was 30 days or more in duration, to-wit: from on or about October 9, 2009 through October 9, 2015, when [appellant] was 17 years of age or older, did commit two or more acts of sexual abuse against [J.S.[1]], a child younger than 14 years of age, and said acts having been violations of one or more of the following penal laws including:
>
> then and there intentionally and knowingly cause the penetration of the anus of [J.S.], a child who was then and there younger than 14 years of age, by defendant's sexual organ;
>
> AND/OR
>
> then and there intentionally and knowingly cause the penetration of the mouth of [J.S.], a child who was then and there younger than 14 years of age, by the defendant's sexual organ;
>
> AND/OR
>
> then and there intentionally and knowingly cause the mouth of [J.S.], a child who was then and there younger than 14 years of age, to contact the defendant's sexual organ, against the peace and dignity of the State.

J.S. was nineteen years old at the time of trial. J.S. testified that the first instance of inappropriate behavior occurred when he was younger than six years old. He recalled being alone with appellant, his father, in appellant and J.S.'s mother's bedroom while appellant watched pornography on the television and J.S. could see what was happening on the screen. J.S. stated the family moved to a new home when he was around seven years old after his sister, A.S., was born. He testified that he could not recall exactly the

---

[1] To protect the identity of the minor child, we refer to him and his relatives by their initials or an alias. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process").

first time that it happened, but that sexual assault began when they first moved into the new home. J.S. stated that the first distinct memory he had of appellant sexually abusing him by anal penetration was in second grade on a Boy Scout's trip. J.S. explained that appellant had already been sexually abusing him orally at the time, so J.S. expected it to happen when they were alone on the trip. J.S. explained that because appellant used a machine for his sleep apnea, they were unable to stay at the campground, and instead rented a motel room near the campground during the trip. That evening was the first instance that J.S. anally penetrated appellant.

J.S. also testified about two separate incidents that occurred while he was showering. Regarding the first incident, J.S. recalled he was in the shower when appellant got in with him and J.S. performed oral sex on appellant. Regarding the second incident, appellant anally penetrated J.S. According to J.S., in both instances, appellant did not ejaculate while in the shower, but instead "it continued into the bedroom" where, in the first instance appellant anally penetrated J.S., and in the second instance, J.S. performed oral sex on appellant.

J.S. explained that he was fearful of appellant. He explained that there were many instances when the abuse physically hurt him, but that he would say he was "fine" because he was afraid. J.S. testified that appellant had a DVD containing pornography that appellant kept hidden in a closet. At one point, J.S. retrieved the DVD and broke it. J.S. testified that when appellant confronted him, he told appellant "I don't want to do this anymore," but nothing changed. J.S. also recalled there was a time when he performed oral sex on appellant in the classroom where appellant taught. J.S. explained that this

3

occurred during the summer and that they initially went to the classroom to clean it up to prepare for the following school year. J.S. also recalled a time where they were in appellant's vehicle. Appellant was driving and J.S. was in the passenger's seat. Appellant told J.S. to unzip J.S.'s pants, and appellant began touching J.S.'s genitals. J.S. testified that the acts of sexual abuse occurred approximately four times a month. Except for one instance that he could recall, J.S. explained that his mother was not home when the abuse would occur. The one time she was, he said the abuse occurred in the early morning hours when his mother was in the shower.

J.S. detailed additional, specific instances of abuse, including a time when appellant had J.S. perform oral sex on appellant, and appellant then penetrated J.S.'s anus with appellant's fingers. J.S. also recalled a time when appellant penetrated him anally and then began kissing his neck. J.S. stated that the kissing was different than the usual abuse and he felt that was something beyond abuse that became a "weird, twisted relationship" with appellant. As J.S. got older, the abuse was mostly appellant penetrating J.S. or appellant performing oral sex on J.S.

J.S. further testified that after the instances of abuse, appellant would often play video games with him as a "reward" because that was something J.S. enjoyed doing with appellant. J.S. also explained that in the third grade, he received a soccer ball as a prize at school, and he and appellant would play a game on the stairs with the ball after instances of abuse, again, as a "reward" of sorts.

After the abuse stopped, before his outcry, J.S. explained that things felt fairly normal in their household because he had a father that had ceased abusing him. He had

4

mixed emotions about whether to "pretend nothing happened" and move on, or to tell someone. On the night of his outcry to his mother, J.S. recalled that she confronted appellant about the allegations after J.S. told his mother what had happened. That evening, appellant tried to communicate with J.S., but J.S. refused to talk to him. J.S. stated that he "was really scared at that point" because he had told his mother their "secret." J.S. did not speak to appellant that night, but recalled watching appellant through his window as appellant packed his car and left. Appellant tried to contact J.S. by phone after leaving, but J.S. did not want to speak with him. J.S. stated that he did communicate with appellant through text message. Text exchanges between J.S. and appellant were admitted without objection as evidence and published to the jury. Appellant sent several messages to J.S., stating in relevant part: "I know you are hurting right now. And I'm sorry for that. I pray that you can forgive me . . . I miss you[,] [A.S.,] and Mama so much right now." J.S. asked him in response, "[h]ow can you be okay with yourself? And just say pray for forgiveness?" to which appellant stated: "I'm not okay with myself. That's just it. I'm not ok." J.S. sent additional messages containing accusations about the abuse to appellant, and appellant continued to ask for forgiveness.

J.S. explained that, after his mother filed a police report regarding his outcry, he was interviewed at the Children's Advocacy Center (CAC) where he was able to discuss the abuse that occurred and write down his thoughts about what had happened. He was also examined at the hospital, which he found to be "really embarrassing" because they had to examine his genitalia and anus "in great detail." He explained it was an unpleasant experience. The examination revealed that he had contracted a sexually transmitted

5

disease. J.S. testified that he had never been sexually active outside of the abuse at the hands of appellant. J.S. testified regarding the ongoing emotional trauma he suffered because of the abuse, explaining how he took a year away from school to be home-schooled to avoid having to discuss with his friends what had happened. Because appellant was a teacher in the system where J.S. attended school, J.S. knew that when the information was released that appellant was arrested, it would lead to a lot of questions and interest in the situation. Since his outcry, J.S. has been in counseling and finds that it has helped him cope with what he went through.

On cross-examination, J.S. stated that appellant was the main disciplinarian in their household when it came to J.S.'s grades. Through J.S., two exhibits were admitted wherein J.S. expressed love and care for appellant namely, a note to his mother and appellant thanking them for everything they had done for him to have a good education, and a Facebook post by J.S. wishing appellant a happy birthday and stating "Happy birthday to the best dada in the world!! You've been such a great father and role model that has shaped me to be the person I am today. Have a fabulous day. I love you." The Facebook post was made the month prior to J.S.'s outcry.

J.S.'s mother and appellant's wife, N.S., testified similarly to J.S. regarding the child's outcry. She also testified that when she confronted appellant regarding the accusations, appellant admitted to sexually assaulting J.S. and informed her that he had been sexually abused by his own brother as a child.

Janeth Del Toro, a family nurse practitioner and sexual assault nurse examiner (SANE), testified that she examined J.S. following his outcry. The SANE exam consists

6

of taking a detailed medical history and a history of what the child experienced, a "head-to-toe physical assessment," and a detailed genital examination, looking for trauma. She explained that J.S. reported the abuse was happening from the ages of approximately seven until he was thirteen, and that it had stopped three years prior to his outcry. Given the lapse of time, she was unable to collect forensic evidence. She also explained that there is unlikely to be trauma during an exam that occurs more than three years after the last abuse occurred "[b]ecause our bodies heal quickly." J.S. did not show any physical signs of injury or trauma. J.S. did test positive for chlamydia, a bacterial infection that is sexually transmitted.

Shawn Edgington, J.S.'s counselor from Hill Country Crisis Council, testified that J.S. was referred to counseling following his interview with the CAC. Edgington testified that J.S. met the criteria for trauma-focused cognitive behavioral therapy. According to Edgington, J.S. "was really good at internalizing a lot of things," but he had breaking points, such as when the news made it to social media that appellant had been arrested and when J.S. was informed that he had a sexually transmitted disease. While the defense questioned whether J.S. may have been manipulating his responses to certain assessments, Edgington explained that she believed what J.S. "was reporting to [her] was real."

Appellant denied all allegations against him, stating he never abused J.S. While he explained that he was not certain of the motive behind the lies, appellant testified that he believed his wife wanted him out of the picture, and she and J.S. concocted this story for that purpose. Appellant explained that he never told N.S. that he had been abused as

7

a child, and he denied that he was ever abused. Appellant testified that it hurt him to hear the lies his family told on the witness stand, and vehemently denied ever having any inappropriate contact with J.S. On cross-examination, appellant was asked about the text messages with J.S. Appellant explained that he was apologizing for leaving the house and not being present in his son's life at that time.

The jury found appellant guilty of continuous sexual abuse of a young child. During the punishment phase, N.S. and J.S. testified for the State and appellant's father, W.S., testified for the defense.

N.S. discussed the effects of this case on A.S., her daughter and J.S.'s sister. She explained that the actions of appellant caused A.S. severe trauma, sadness, and anger. A.S. has difficulty coping with what happened to her brother and is having sleep issues. N.S. explained further that, as she looks back at photos of her son growing up, she feels anger and sadness because she knows that behind his smile was the pain of the abuse he was going through. She stated that she is indifferent toward appellant and will let "God [] judge him" for his actions.

J.S. explained he felt "mass amounts of gratitude" when he heard the verdict from the jury. He testified that the abuse will always have an impact on his life, but that he is going to use it to help others recover from similar situations, explaining that the people who have helped him have "just been amazing." He explained that he was angry that appellant did not "turn himself in" so that he did not have to go through the trial process, but now that it is over, he is ready to move forward with his life.

W.S. testified on behalf of appellant, his son. With no objection, appellant's father read a letter he wrote as part of his testimony wherein he explained that his son grew up in a "loving family" including an older brother and sister. The family regularly attended church and, according to W.S., appellant continued that faith-based lifestyle with his own children. He described appellant as "gentle" and loving. He stated that even after the jury's verdict, he cares for and loves his son. He also described J.S., his grandson, as loving and kind. W.S. testified on cross-examination that it was difficult for him to sit through the trial. He stated that appellant was never abused as a child. He explained that he "cannot fathom and believe all the things that ha[d] been said in th[e] trial about [his] son." He stated he would have no concerns about his son being around children.

The jury assessed punishment at thirty-five years' incarceration. Appellant filed a motion for new trial claiming ineffective assistance of counsel. After a hearing on the motion, the trial court denied the motion. This appeal followed.

## II.   INEFFECTIVE ASSISTANCE OF COUNSEL

The United States and Texas Constitutions guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *see* TEX. CODE CRIM. PROC. ANN. art. 1.051; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To obtain a reversal of a conviction on grounds of ineffective assistance of counsel, an appellant must show: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S.

9

at 687). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694).

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. "We commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813.

> We review a trial judge's denial of a motion for new trial under an abuse of discretion standard. "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." A trial judge abuses his discretion in denying a motion for new trial when no reasonable view of the record could support his ruling. We view the evidence in the light most favorable to the trial judge's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party.

*Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014) (internal citations omitted).

10

## A.     Failure to Designate an Expert Witness

By his first sub-issue, appellant argues that his trial counsel was ineffective for failure "to consult or retain experts and failed to move the trial court for funds to do the same." Appellant argues that his trial counsel should have consulted with and called an expert witness in the field of forensics. He argues an expert was necessary to controvert the testimony of Del Toro that J.S. having no sign of trauma was normal given the lapse of time between the last incident of abuse and the outcry.

The State, in a reply point on appeal, argues that the issue of whether an expert should have been retained was not properly before the trial court in appellant's motion for new trial. Specifically, the State argues that because appellant did not provide an affidavit supporting his claim related to the expert witnesses at the time he filed his motion for new trial, the trial court could not have considered those claims at the motion for new trial. Because of this, the State argues that this Court must consider the claim related to expert witnesses as though it were raised for the first time on appeal, based solely on the record and "without giving consideration to the evidence presented at the hearing on motion for new trial." *See Cueva v. State*, 339 S.W.3d 839, 859 (Tex. App.—Corpus Christi–Edinburg 2011, pet ref'd). We agree. Because the affidavits were not filed with the motion for new trial to support the specific claims therein, we find that those issues were not properly before the trial court. As such, we address appellant's issues regarding the retention of expert witnesses as though they have been presented for the first time on appeal. *See Martinez v. State*, 74 S.W.3d 19, 21–22 (Tex. Crim. App. 2002) (stating that when new trial is founded upon matters not discernible from the record, the allegations in

11

the motion must be supported by affidavit illustrating their accuracy before the movant is entitled to a hearing).

Appellant's trial counsel testified at the motion for new hearing and when asked about retention of an expert witness, trial counsel explained:

> Well, there was mention by [appellant] that he—he wanted to call a—a child doctor, a pediatrician and—but in the trial and in the discovery there was no scientific evidence, there was no—there was no evidence, no DNA, no blood, none of that, so I didn't—it didn't—I didn't think it was wise to call an expert to rebut something that wasn't going to come up. And I—and I expected that a doctor would want to, if anything, . . . ask him about DNA or blood, injuries, stuff like that.

When specifically asked if an expert should have been called to rebut Del Toro's testimony regarding the lack of injuries after a significant lapse of time, trial counsel explained that it was his "experience [] that they always say that."

In considering a claim of ineffective assistance of counsel, appellate courts will not second-guess counsel's trial strategy; the fact that another attorney might have pursued a different course also does not support a finding of ineffectiveness. *Hernandez v. State*, 84 S.W.3d 26, 35 (Tex. App.—Texarkana 2002, pet. ref'd). Trial counsel testified that he had taken similar cases to trial and was prepared for what a SANE nurse would testify to, as Del Toro did in this situation. Because counsel was aware that there was no physical evidence, such as DNA involved in the case, he made the strategic decision not to call a doctor or expert to rebut the testimony related to the SANE exam. While appellant's appellate counsel may have pursued the case differently, this does not overcome the recognized presumption in favor of a viable trial strategy. *See id.*

12

Appellant also asserts that trial counsel was ineffective for failing to call an expert witness at the punishment phase of trial. Specifically, he contends that a mitigation expert or an evaluation to determine if appellant "possessed the characteristics of a sexual predator" would have been beneficial at the punishment stage. Appellant also asserts that counsel was ineffective for failing to seek funds to find an expert willing to examine the evidence in the case and for mistakenly believing he could not do so. However, appellant points to no specific evidence or testimony that should have been discovered or presented regarding mitigating factors or appellant's character traits, and therefore, he does not explain how the testimony sought would have been beneficial to his defense. *See Crawford v. State*, 355 S.W.3d 193, 199 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

## B. Failure to Call Material Witnesses

Appellant next suggests that trial counsel was also ineffective for failing to interview and call family witnesses at the guilt-innocence phase of trial. At the motion for new trial hearing, appellant's brother, father, and sister-in-law testified regarding the family life. On appeal, appellant argues that trial counsel should have called these witnesses to "combat[] [N.S.'s] testimony regarding the family history of abuse." To obtain relief on an ineffective assistance claim based on an uncalled witness, the defendant must show that the witness was available to testify and the testimony sought would have been of some benefit to his defense. *See Ex parte White,* 160 S.W.3d 46, 52 (Tex. Crim. App. 2004); *see also Crawford*, 355 S.W.3d at 199; *Pinkston v. State,* 744 S.W.2d 329, 332 (Tex. App.—Houston [1st Dist.] 1988, no pet.) ("An attorney's failure to investigate or present

13

witnesses will be a basis for establishing ineffective assistance of counsel only where it is shown that the witnesses would have been available and that the presentation of the evidence would have benefitted appellant.").

Trial counsel testified that he did not think the witnesses were necessary to combat N.S.'s testimony, and that they were not "relevant to the [d]efense." Trial counsel considered calling these witnesses and chose not to for strategic reasons, and we will not second guess his trial strategy. *See id.* Additionally, the testimony that appellant states would have combatted N.S.'s testimony regarding appellant having been sexually abused was elicited when appellant took the stand in his defense. Appellant does not explain how his brother's cumulative testimony would have benefited his defense. Nor does he explain how generalities related to his upbringing and family life as testified to by his family would have benefitted his defense. In any event, much of the same information was testified to by appellant himself. *See Crawford*, 355 S.W.3d at 199.

## C.    Failure to Obtain Medical Records

By his final sub-issue, appellant asserts that trial counsel was ineffective for failing to obtain J.S.'s medical and school records. He makes the blanket assertion that "each visit to a doctor was an opportunity for J[.]S[.] to describe acts to his private parts that caused injury, discomfort, and/or bleeding as a child would to a doctor or nurse." Appellant also argues that the symptoms of chlamydia could have been discovered. Appellant presents no testimony or evidence regarding these records or what was contained in the records that would have been admissible to prove what he alleges in his motion for new trial. *See id.*

We overrule appellant's sole issue.

### III.  CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
19th day of October, 2023.

15